UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DYNAMIC AIR INC.,                                  Case No. 05-CV-0955 (PJS/RLE)

                              Plaintiff,

                                                   MEMORANDUM OPINION AND ORDER
v.                                                 ON CROSS-MOTIONS FOR SUMMARY
                                                   JUDGMENT
REICHHOLD, INC.,

                              Defendant.

Lenae M. Pederson and Erica Gutmann Strohl, MEAGHER & GEER, PLLP, for
plaintiff.

Edward T. Matthews, FREDRIKSON & BYRON, PA, for defendant.

This case arises out of a transaction in which plaintiff Dynamic Air Inc. ("Dynamic Air")

manufactured, delivered, and helped to set up a pneumatic-conveyance system for defendant

Reichhold, Inc. ("Reichhold").  Dynamic Air brings claims of breach of contract and unjust

enrichment against Reichhold, alleging that Reichhold paid only a portion of what it owes to

Dynamic Air.  Reichhold brings a number of counterclaims, alleging that the system failed to

work correctly and ultimately imploded because of errors made by Dynamic Air.  Reichhold's

counterclaims include a claim that the parties' contracts are void because Dynamic Air provided

professional-engineering services without a license, as well as claims for engineering

malpractice, failure to warn, and breach of contract.[1]

This matter is before the Court on the parties' cross-motions for summary judgment.

Dynamic Air seeks the dismissal of all of Reichhold's counterclaims.  Reichhold seeks the

---

[1]Reichhold also counterclaimed for misrepresentation, but it has since voluntarily
withdrawn that counterclaim. [Docket Nos. 140, 141.]

dismissal of all of Dynamic Air's claims and a ruling that it can recover consequential damages from Dynamic Air.

## I.  BACKGROUND

### A.  *Factual Background*

Reichhold is a Delaware corporation with its principal place of business in North Carolina.  Reichhold manufactures coatings and composites for industrial, manufacturing, and architectural uses.  In 2003, Reichhold decided to expand its Morris, Illinois manufacturing plant and automate its storage and delivery system for certain raw materials used to produce polyester resins.  To that end, Reichhold hired Dynamic Air, a company incorporated and headquartered in Minnesota, to design and manufacture a pneumatic-conveyance system.  Dynamic Air designs, manufactures, sells, and services pneumatic equipment and conveyance systems that use pressurized air or other gases to convey materials through closed-pipeline systems in industrial settings.  The specifics of the formation of the parties' sales contract are described in more detail in the Court's order on the parties' first set of dispositive motions [Docket No. 81].

Dynamic Air provided a series of written proposals to Reichhold, culminating in Dynamic Air's Proposal #03-0196E, which was submitted to Reichhold on October 3, 2003. That final proposal included five integrated sub-systems as follows:

| Name | Purpose | Price |
|------|---------|-------|
| System 100 | To convey isophthalic acid and terephthalic acid from customer-provided railcars to dedicated storage silos based on [defined] material characteristics and design parameters | $214,865.00 |

| System 200 | To convey isophthalic acid and terephthalic acid from customer-provided PD trucks to dedicated storage silos based on [defined] material characteristics and design parameters | $37,902.00 |
| System 300 | To convey isophthalic acid from a dedicated storage silo to a dedicated receiving hopper based on [defined] material characteristics and design parameters | $71,317.00 |
| System 400 | To convey terephthalic acid from a dedicated storage silo to a dedicated receiving hopper based on [defined] material characteristics and design parameters | $42,728.00 |
| System 500 | To weigh and convey isophthalic acid and/or terephthalic acid from a weigh hopper to a batch hopper based on [defined] material characteristics and design parameters | $126,773.00 |

First Am. Compl. Ex. A. [Docket No. 74]; Matthews Aff. Ex. A, Jan. 26, 2007 [Docket No. 118].

After Dynamic Air designed and manufactured the system, Reichhold requested Dynamic Air's assistance in setting up the system. To provide these start-up services, Dynamic Air employees visited Reichhold's Morris plant a total of 36 times from September 2004 through mid-November 2004. Colwell Aff. ¶ 4, Dec. 2, 2005 [Docket No. 44]. The parties agree that the *sales* contract did not govern these visits, as Dynamic Air had no obligation, under the sales contract, to help Reichhold get the system set up. The parties otherwise disagree, though, about the terms under which these visits were provided.

Dynamic Air contends that all of the visits were provided under its standard *service* contract. Critical to this action, Dynamic Air's standard service contract includes limitations on incidental and consequential damages. Thus, if Dynamic Air is correct, Reichhold's recoverable damages in this action would be limited to a refund of any amounts that it paid Dynamic Air to

make the visits.  Strohl Decl. Ex. CC, Nov. 20, 2006 [Docket No. 110] ("Strohl Decl.").

Reichhold would be unable to recover the significant consequential damages that it claims.

For its part, Reichhold concedes that it agreed to Dynamic Air's standard service contract — but only, it insists, for Dynamic Air's first two visits, which occurred in early September 2004.  After that, Reichhold contends, the parties did not have an express contract governing the remaining 34 visits.  As far as Reichhold is concerned, whether an implied contract governed those visits — and the terms of any such implied contract — are questions of fact for the jury to decide.  As evidence that any implied contract did not include a consequential-damages exclusion, Reichhold claims that it sent a purchase order to Dynamic Air in September 2004, and that the purchase order did not include a consequential-damages exclusion.  Moreover, Reichhold points out that it provided two purchase-order *numbers* to Dynamic Air — one covering the first two visits in early September 2004, and the other covering all subsequent visits.  According to Reichhold, this bolsters its claim that the first two visits were governed by different terms than the subsequent visits.

Because the specifics of the parties' communications about the start-up services are obviously important, the Court will now review the record evidence regarding those communications:

Dynamic Air first e-mailed a copy of its service contract to Reichhold on July 8, 2004. Strohl Decl. Ex. DD.  On August 6, Dynamic Air followed up with an e-mail to Reichhold explaining the scheduling of the "mechanical & electrical check-out, start-up, and training" to be performed by its service department "at an additional cost as outlined in the service contract forwarded to [you]."  Hartshorn Aff. Ex. D, Dec. 5, 2005 [Docket No. 42] ("Hartshorn Aff.").

On September 2, Dynamic Air again e-mailed a copy of the service contract to Reichhold, and requested that Reichhold "review, sign, and return [the contract] to [Dynamic Air] as soon as possible." Strohl Decl. Ex. EE. In response to this e-mail, Reichhold faxed a signed copy of the contract to Dynamic Air, and sent an e-mail to confirm the fax. Stringer Aff. ¶ 13 & Ex. A, Jan. 23, 2007 [Docket No. 116] ("Stringer Aff."). The contract was signed by Reichhold's Glynn Stringer on September 3, and included blank spaces for filling in the beginning and ending dates of service. In those spaces, Stringer wrote "September 7, 2004" and "September 9, 2004." Strohl Decl. Ex. CC. Stringer also wrote a purchase-order number on the contract. *Id.* Meanwhile, Dynamic Air had already sent another e-mail that same day (September 3) requesting that Reichhold review and sign Dynamic Air's contract as soon as possible. Strohl Decl. Ex. FF. In response, Reichhold's John Falkenberg sent Dynamic Air a different purchase-order number "for this job." Strohl Decl. Ex. FF.

Although the initial service contract — the one that Reichhold signed — had an end date of September 9, Dynamic Air continued providing start-up services to Reichhold for two more months. As noted above, Dynamic Air employees visited Reichhold's plant 34 more times after September 9. During those two months, Dynamic Air sent copies of its service contract to Reichhold at least two more times, on September 23 and September 27. Strohl Decl. Exs. GG, HH.

Reichhold contends that, at some point in September, it sent a copy of a purchase order to Dynamic Air containing its own terms and conditions. Stringer Aff. ¶ 14. Specifically, Stringer states in an affidavit that, by the time Dynamic Air sent the additional copies of its service contract in late September, Falkenberg had already sent a Reichhold purchase order to Dynamic

Air — a purchase order that contained Reichhold's terms and conditions. *Id.* Dynamic Air denies that it received any such purchase order.

The problem for Reichhold is that Stringer's affidavit is the only evidence that it sent a purchase order to Dynamic Air, and nowhere in that affidavit does Stringer say how he knows that Falkenberg sent the purchase order. Rule 56(e) of the Federal Rules of Civil Procedure requires affidavits submitted in connection with summary-judgment motions to "be made on personal knowledge" and "set forth such facts as would be admissible in evidence[.]" Stringer's affidavit does not describe the source of his knowledge about Falkenberg's actions, nor does it give the Court any basis for concluding that Stringer's statement about Falkenberg's actions is admissible in evidence. Moreover, in the course of discovery, Dynamic Air asked Reichhold to identify anyone who could testify that he or she sent the purchase order. Reichhold answered under oath, "None." Strohl Decl. Ex. JJ. That evidence is, of course, admissible against Reichhold. For purposes of resolving the pending motions, then, the Court must assume that Reichhold never sent a purchase order to Dynamic Air. *See Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 728 (8th Cir. 2001) (a statement in an affidavit that is not based on personal knowledge does not create a factual issue); *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005) (hearsay contained in an affidavit may not be used to support or defeat a summary-judgment motion); *cf. Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983) (a party cannot create issues of fact by contradicting its own earlier testimony).

The parties vigorously dispute the nature of the start-up services that Dynamic Air provided to Reichhold. Dynamic Air contends that it made essentially minor adjustments to a previously designed product. Reichhold contends that Dynamic Air performed extensive

engineering work.  This dispute is important because, as is described below, Reichhold claims that Dynamic Air provided professional-engineering services without being properly licensed to do so.

A dispute eventually arose between the parties over amounts owed by Reichhold for start-up services and "back charges," which appear to be expenses Reichhold incurred in attempting to remedy numerous defects in the system.  *See* Hartshorn Aff. ¶ 30 & Ex. F. Dynamic Air stopped providing services in mid-November 2004.  Reichhold claims that Dynamic Air "abandoned" the project, whereas Dynamic Air claims that Reichhold asked it to stop coming to Reichhold's plant.  On December 28, 2004, two of the silos that were part of the system imploded, rendering the system inoperable, and causing Reichhold to suffer significant consequential damages.

### B.  Procedural History

Dynamic Air filed this action on May 19, 2005, seeking to recover payments that it claims Reichhold still owes it.  Reichhold counterclaimed for damages caused by the implosion, which Reichhold blames on Dynamic Air.  Reichhold also seeks to recover payments it made for certain components of the purportedly incomplete system supplied by Dynamic Air.  The case was initially assigned to Judge Donovan Frank.

The parties briefed and argued a first round of dispositive motions before Judge Frank, who made a number of important rulings that have guided the subsequent course of this case. [Docket No. 81.]  Judge Frank rejected Reichhold's argument that Dynamic Air failed to comply with state licensing requirements applicable to professional engineers.  Judge Frank also rejected Reichhold's argument that the consequential-damages exclusion in the sales contract is

overbroad and unenforceable. Instead, Judge Frank found that the sales contract, and the consequential-damages exclusion it contains, are valid and enforceable, and that, as a result, Reichhold may not seek consequential damages in connection with any breach of the *sales* contract. Judge Frank also held that the sales contract was predominantly for the sale of goods, and therefore is governed by the Uniform Commercial Code. Finally, Judge Frank held that there was a factual dispute about the terms and conditions governing the parties' *service* contract — that is, the contract or contracts governing the 36 visits made by Dynamic Air.

After Judge Frank issued his order, the case was reassigned to the undersigned, and the parties engaged in further discovery. Dynamic Air now moves for summary judgment on the basis that this new discovery establishes that the parties' service contract, like the sales contract, includes a consequential-damages exclusion. Dynamic Air also argues that Reichhold made changes to the system and thereby voided the warranty in the sales contract. Finally, Dynamic Air moves for summary judgment on Reichhold's failure-to-warn claim.

Reichhold responds by moving for summary judgment on Dynamic Air's claims. Reichhold argues that, because the Dynamic Air personnel who performed the start-up services were not licensed to practice engineering in either Illinois or Minnesota, the service contract is void, Dynamic Air may not seek or retain payments under it, and Reichhold's right to recover consequential damages is not limited by it.

## II. ANALYSIS

### A. *Standard of Review*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is genuine only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court must assume that the nonmoving party's evidence is true and must draw all justifiable inferences arising from the evidence in that party's favor. *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003).

### B. Reichhold's Motion

Reichhold argues that, whether Dynamic Air's service contract controlled only the first two visits or all 36 visits, the service contract is void because no one from Dynamic Air who performed services pursuant to the contract was licensed to practice as a professional engineer in either Illinois or Minnesota. Voiding the service contract would have a twofold effect: First, Dynamic Air could not seek compensation for the services that it provided under the contract. Second, the contract's limits on consequential damages would not apply to Reichhold's claims against Dynamic Air.

Dynamic Air contends that Judge Frank already rejected this argument and that Reichhold has failed to seek leave to file a motion for reconsideration, as required by Local Rule 7.1(g). In response, Reichhold argues that Judge Frank ruled only that the *sales* contract was valid despite Dynamic Air's lack of compliance with state licensing requirements, and that Judge Frank did not address the validity of the *service* contract. As Judge Frank noted, however,

Dynamic Air's claims have from the beginning rested primarily on the service contract, not the sales contract.[2]  Thus, when Reichhold sought summary judgment on Dynamic Air's claims on the basis that Dynamic Air was not properly licensed [Docket No. 81 at 5], Reichhold was necessarily asking Judge Frank to determine the validity of the service contract.  Reichhold has indeed filed what amounts to a motion to reconsider without seeking leave of the Court.  Nevertheless, because Reichhold's motion includes a choice-of-law issue that Judge Frank did not expressly address, and because the parties have already briefed and argued Reichhold's motion, the Court will address the motion on the merits.

The parties first dispute which state's law should apply to the issues presented in Reichhold's motion.  Dynamic Air argues that, because the service contract, like the sales contract, includes a Minnesota choice-of-law clause, Minnesota law should apply to the issue of whether Dynamic Air was required to be licensed and what consequences should flow from any failure to meet that licensing requirement.  Reichhold contends that the general choice-of-law rules applied by Minnesota courts dictate that Illinois law should apply to these issues.

Before the Court can apply any clause of the contract — including the choice-of-law clause — the Court must first determine whether the contract is valid.  The choice-of-law clause therefore cannot govern the question of what law determines the contract's validity.  Instead, as Reichhold asserts, the usual conflict-of-law analysis applies.  Because this Court sits in Minnesota, it must apply the choice-of-law rules applied by Minnesota courts.  *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941).

---

[2]Dynamic Air is apparently also seeking a small amount of money under the sales contract, but the majority of its claim is for payments owed under the service contract.

Reichhold is correct that Minnesota's choice-of-law rules seem to point to the application

of Illinois law.  It simply makes no sense to apply Minnesota's licensing statute to conduct that

took place entirely in Illinois.  But the Court need not undertake a formal choice-of-law analysis,

because there is no conflict between Illinois and Minnesota law.  *See Prudential Ins. Co. of Am.*

*v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007) (before applying Minnesota's choice-of-law rules,

the court must first determine whether a conflict exists).  Specifically, under either state's law,

Dynamic Air was not required to be licensed in order to perform the start-up services.  Judge

Frank has already explained why Minnesota law did not require Dynamic Air to be licensed.

This Court will now explain why the same is true under Illinois law.

Illinois, like Minnesota, requires a license to practice engineering:

> It is unlawful for any person, sole proprietorship, professional
> service corporation, corporation, limited liability company, or
> partnership, or other entity to practice professional engineering . . .
> unless such person holds an active license as a professional
> engineer in the State of Illinois[.]

225 Ill. Comp. Stat. 325/40.  The parties heatedly dispute whether Dynamic Air was engaged in

the practice of professional engineering when it provided start-up services at Reichhold's plant.

The Court need not decide whether or not Dynamic Air was engaged in the practice of

professional engineering,[3] however, because Illinois has carved out an exception to the licensing

---

[3]The question of how to determine what constitutes the unlicensed practice of
professional engineering in Illinois is a complex one.  Recently, the Supreme Court of Illinois
declined to answer the question of whether the work of an engineer who was retained as an
expert witness constituted the unlicensed practice of professional engineering.  *Thompson v.
Gordon*, 851 N.E.2d 1231, 1237 (Ill. 2006).  The court explained that it is the province of the
state's Department of Financial and Professional Regulation ("the Department") to determine
what constitutes the unlicensed practice of professional engineering in the first instance.  *Id.*
Although the Department's determinations are subject to review under the state's administrative-
review law, that review is very deferential.  *See, e.g., Van Breeman v. Dep't of Prof. Regulation*,

requirement for services performed in connection with the production, sale, and installation of products and systems.  Specifically, the licensing requirement does not apply to "[s]ervices performed by employees of a business organization engaged in . . . manufacturing operations . . . which are rendered in connection with the fabrication or production, sale, and installation of products, systems, or nonengineering services of the business organization or its affiliates."  225 Ill. Comp. Stat. 325/3(b)(4).  No reported case construes this language, but Dynamic Air's start-up services appear to fit squarely within the exception.  Dynamic Air is a "business organization engaged in . . . manufacturing operations," and the start-up services that its employees performed at Reichhold's plant were unquestionably "rendered in connection with the . . . production, sale, and installation" of a Dynamic Air product or system.

Reichhold makes two arguments to the contrary.  First, Reichhold contends that the pneumatic-conveyance system is not a "product" because it was custom-built.  But the word "product" is not limited to items that are mass-produced.  *See* American Heritage Dictionary of the English Language (4th ed. 2000) (defining "product" as "[s]omething produced by human or

---

694 N.E.2d 688, 691 (Ill. App. Ct. 1998) (Department's findings are prima facie true and correct).  Thus, it appears that Illinois courts have not fleshed out any principles that this Court could apply in determining what constitutes the unlicensed practice of professional engineering.

The Court notes that Reichhold has offered an affidavit from John M. McKinney, a member of the Professional Engineer Complaint Committee of the Department, opining that Dynamic Air's start-up services constituted the practice of professional engineering.  McKinney Aff. ¶¶ 3, 20, Jan. 23, 2007 [Docket No. 117.]  McKinney's opinion is obviously competent evidence that Dynamic Air's start-up services were professional-engineering services, but the affidavit is not controlling on that question or on the separate question of whether Dynamic Air's conduct, even if it constituted professional-engineering services, fit within the exception to the licensing statute for services "rendered in connection with the fabrication or production, sale, and installation of products [or] systems[.]"  *Cf. Thompson*, 851 N.E.2d at 1238 (noting that the Department's finding that the expert witness violated the licensing statute was not dispositive of the legal question of whether licensure is a prerequisite to testifying as an engineering expert).

mechanical effort or by a natural process").  Moreover, the exception also applies to services rendered in connection with the sale or installation of "systems," and Reichhold has offered no reason why the pneumatic-conveyance system is not a "system" within the meaning of the exception.

Second, Reichhold argues that the services were not rendered "in connection with" the production, sale, and installation of the system, because the services were performed under a separate contract and, had it wanted, Reichhold could have hired someone else to perform them. This is a non sequitur.  Obviously services provided under one contract can be rendered "in connection with" a system sold under another contract.  The start-up services performed by Dynamic Air — services directly related to installing and rendering operative the system that it manufactured for Reichhold — were unquestionably "[s]ervices performed by employees of [Dynamic Air] . . . rendered in connection with the . . . production, sale, and installation of . . . [a] system[] . . . of [Dynamic Air]."  That is all that the statute requires.

The Court therefore concludes that Dynamic Air's start-up services plainly fit within the exception to Illinois's engineering-license requirement.  Because Dynamic Air was not required to be licensed to perform those services under either Minnesota law (for the reasons explained by Judge Frank) or under Illinois law (for the reasons explained by the undersigned), the parties' service contract is valid and enforceable.  Reichhold's motion for summary judgment is therefore denied, and Count I of its counterclaim (alleging that Dynamic Air failed to comply with state licensing requirements) is dismissed with prejudice.

*C.  Dynamic Air's Motion*

1.  Consequential Damages

Having concluded that Dynamic Air's service contract is valid, the Court must now determine what services that contract covered.  There is no dispute that Dynamic Air's standard service contract covered Dynamic Air's first two visits, on September 8 and September 9, 2004. Dynamic Air contends that all of the remaining 34 visits were also covered by the terms and conditions of its standard service contract, which was sent to Reichhold at least twice after September 9.  Reichhold disagrees.  It contends that the parties did not have an express contract governing the remaining visits, and the question of whether the parties had an implied contract is for the jury to decide.

"When a contract governs the duties of the parties for a specified term and it has expired, the parties may thereafter enter into a new contract by conduct (continued payment and performance) or otherwise, and they may adopt the provisions of their former contract or agree to modify them."  *Bolander v. Bolander*, 703 N.W.2d 529, 542 (Minn. Ct. App. 2005).  Although the existence and terms of an implied contract are normally questions of fact, they become questions of law when the relevant facts are undisputed and a reasonable jury can make only one finding.  *See TNT Props., Ltd. v. Tri-Star Developers LLC*, 677 N.W.2d 94, 101 (Minn. Ct. App. 2004).

The record stands as follows:  Dynamic Air has submitted evidence that it sent copies of its terms and conditions to Reichhold on several occasions.  Before Dynamic Air began providing start-up services, Reichhold expressly accepted Dynamic Air's terms and conditions for the first two visits to Reichhold's plant.  Dynamic Air later sent additional copies of these

same terms and conditions, after which Dynamic Air visited Reichhold's plant almost three dozen times.  There is no evidence that Reichhold ever objected to Dynamic Air's terms and conditions.

Reichhold argues that the time limitation in the first contract (i.e., the fact that it was expressly limited to September 7 through September 9, 2004) and the fact that Reichhold provided two different purchase-order *numbers* (but not actual purchase *orders*) to Dynamic Air evidenced Reichhold's intent not to agree to Dynamic Air's terms and conditions for subsequent visits.  According to Reichhold, one of the purchase-order numbers was to cover the first two visits, and the other purchase-order number was to cover all subsequent visits, thus demonstrating that Reichhold drew a sharp distinction between the first two visits and all later visits.  But Dynamic Air sent copies of its service contract to Reichhold at least two more times *after* the first two visits — and *after* the two purchase-order numbers were provided — without ever hearing a word of objection to its terms from Reichhold.  Moreover, there is no evidence that Reichhold objected to the consequential-damages exclusion in the *sales* contract — which, after all, was at least as significant a limitation on Reichhold's rights as the consequential-damages exclusions in the service contracts.  In light of these undisputed facts, no reasonable jury could find that providing two different purchase-order numbers — without more — demonstrated Reichhold's rejection of Dynamic Air's terms and conditions.  In the absence of any evidence that Reichhold actually sent a copy of a purchase order with different terms or otherwise manifested a lack of intent to agree to Dynamic Air's terms, the record does not support an inference that Reichhold rejected Dynamic Air's terms and conditions.

-15-

The formation of a contract is judged by the parties' objective conduct, not by their subjective intent.  *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006).  Although it is true, as Reichhold points out, that once the initial, signed contract expired the parties were free to adopt different terms, there is simply no objective evidence that they *did* so.  Instead, their undisputed course of conduct establishes an objective intent to continue to operate under the terms of Dynamic Air's standard service contract.  The Court holds that, after the first service contract expired, "the parties . . . thereafter enter[ed] into a new contract by conduct . . . and . . . adopt[ed] the provisions of their former contract . . . ." *Bolander*, 703 N.W.2d at 542.  Thus, the terms and conditions of Dynamic Air's standard service contract — including the exclusion of consequential damages — applied to all of the start-up services provided by Dynamic Air.  Dynamic Air's motion for summary judgment is granted with respect to this issue.

One final point is worth mentioning:  The parties spill much ink on the question of whether Reichhold's damages were incurred by a breach of the sales contract or a breach of the service contract.  But both contracts prohibit the recovery of consequential damages, and thus the answer to that question appears to be irrelevant.  True, the language of the consequential-damages exclusions differs slightly between the contracts.  But neither party has addressed these differences; to the contrary, both parties have briefed and argued two rounds of dispositive motions on the assumption that Reichhold will not be able to recover consequential damages on any of its claims if — as Judge Frank and the undersigned have now held — both the sales and service contracts contain valid consequential-damages exclusions.  The Court takes the parties at their word and finds that, because both the sales contract and the service contract are valid, and

because both contracts contain consequential-damages exclusions, Reichhold is barred from recovering consequential damages on any of its claims in this case.

### 2. Direct Damages

Dynamic Air argues that Reichhold is seeking only consequential damages, recovery of which, the Court has just held, is barred by the consequential-damages exclusions in the parties' contracts. But Reichhold identifies three categories of what it claims are direct damages that it seeks from Dynamic Air. First, Reichhold claims that Dynamic Air failed to complete the System 100 component; Reichhold seeks the $214,865.00 that it paid for that component, plus the costs that it incurred to install it.[4] Second, Reichhold argues that it is entitled to recover $125,000.00 in "back charges" for various problems that it encountered during the start-up phase; these "back charges" were incurred to pay for such things as the redesign of the wiring of the oxygen sensors. Third, Reichhold argues that it is "entitled to recover what it paid for the systems that malfunctioned." Def.'s Mem. Opp. Summ. J. 22. These are the only direct damages Reichhold identifies.

### i. Whether the Back Charges Are Direct or Consequential

Dynamic Air does not dispute that, to the extent that Reichhold is seeking a refund of the purchase price for a component that was defective when delivered, Reichhold is seeking direct damages. If, for example, Reichhold paid Dynamic Air $1000 for a sensor, and the sensor

---

[4]Reichhold did not plead a breach-of-contract claim relating to Dynamic Air's alleged failure to complete System 100. Instead, Reichhold's breach-of-contract claim alleges that the system did not perform as warranted in the contract. [Docket No. 76 ¶¶ 61-63.] Dynamic Air has not pointed out this omission, however, and the parties have litigated this case as though Reichhold's System 100 claim had been pleaded properly. The Court will therefore treat it as if it had been raised in the pleadings. *See* Fed. R. Civ. P. 15(b).

delivered by Dynamic Air was defective, then Reichhold's claim for the return of its $1000 would be a claim for direct damages, unaffected by the consequential-damages exclusions in the contracts.

It is not clear, however, whether Dynamic Air is disputing Reichhold's characterization of the $125,000.00 in back charges as direct damages. The parties' briefing regarding the nature of these damages is sparse, and the record is not entirely clear. It appears, though, that in many instances, Reichhold is not seeking a refund of the money that it paid for a defective component, but rather is seeking to recover money it paid to replace or redesign a defective component. *See* Hartshorn Aff. Ex. F. To the extent that is true, recovery of those expenses may be barred by the damages exclusions in the parties' contracts. *See* Strohl Decl. Ex. B (limiting Dynamic Air's liability under the sales contract to the actual price of the system paid by Reichhold); *id.* Ex. CC (limiting Dynamic Air's liability under the service contract to the costs and fees incurred on the service visit); *cf. Computrol v. Newtrend, L.P.*, 203 F.3d 1064, 1070-71 (8th Cir. 2000) (holding, under Illinois law, that a similar contractual limitation on recoverable damages barred the recovery of prospective lost profits).

### ii. Whether Reichhold Voided the Warranty in the Sales Contract

Dynamic Air argues that Reichhold cannot recover on its warranty claim because Reichhold made changes to the system during the start-up phase. The sales contract expressly disclaims all warranties, whether express or implied, save for the following warranty:

> For a period of one (1) year from the date of shipment, Seller warrants that the SUPPLY sold by Seller will perform and function within the specifications, conditions and limitations published by Seller in its proposal to Buyer. Seller makes no warranties with respect to any portion of the SUPPLY sold but not manufactured by Seller.

> Seller's liability under this Warranty is expressly limited to
> correction within a reasonable time, using Seller's best efforts, of any
> defects or errors, which in the judgment of Seller were made by it in the
> design of the SUPPLY, and to the repair or replacement of any parts of the
> SUPPLY which are defective in material or workmanship by making
> available FOB Seller's plant a repaired or replacement part, provided such
> defective parts are returned to Seller at Buyer's expense.
> . . . .
>
> *The Warranty provided herein shall apply only if . . . the SUPPLY
> has not been altered.*

Strohl Decl. Ex. B (emphasis added).  The sales contract defines "supply" as "the scope of

supply and the equipment furnished by Seller under the contract[.]"  *Id.*  According to Dynamic

Air, Reichhold made alterations to the system during the start-up phase, and those alterations

voided the warranty.

Reichhold does not dispute that it altered the system, but it argues that the alterations did

not void the warranty for three reasons:  First, Dynamic Air abandoned Reichhold, thereby

forcing Reichhold to make the alterations.  Second, the warranty never took effect — and

therefore could not have been voided — because Dynamic Air never completed the System 100

component.  And third, the alterations were not material.  The Court will address each of these

arguments in turn.

Reichhold's "abandonment" argument is based on the fact that, after making 36 visits to

the Illinois plant, Dynamic Air stopped providing start-up services to Reichhold in mid-

November 2004.  Reichhold stops short of claiming that Dynamic Air's cessation of services

breached either of the parties' contracts, however.  As Reichhold itself argues, the start-up

services were not warranty services required under the sales contract; the parties contracted

separately for the start-up services under the terms of the service contract (as the Court has found

above).  Reichhold has pointed to absolutely nothing in the service contract that obligated

Dynamic Air to continue providing start-up services to Reichhold past the point when Dynamic

Air stopped providing them.  The mere fact that Dynamic Air stopped performing start-up

services under the *service* contract did not give Reichhold carte blanche to alter the system

without voiding the warranty in the *sales* contract.

Reichhold next argues that the warranty never took effect — and thus could not have

been "breached" — because Dynamic Air failed to complete System 100.  Reichhold relies

heavily on *City of Willmar v. Short-Elliott-Hendrickson, Inc.*, 475 N.W.2d 73 (Minn. 1991).  In

*City of Willmar*, the Minnesota Supreme Court held that, because the warranty at issue required

delivery of goods that would satisfy specified performance standards, no cause of action for

breach of warranty accrued — and the statute of limitations did not begin to run — until the

goods were installed and tested.  *Id.* at 81.  Reichhold argues that, because Dynamic Air never

completed System 100, the entire system that it purchased from Dynamic Air has never been

fully installed and thus, under *City of Willmar*, the warranty has never taken effect.  Because the

warranty has never taken effect, Reichhold argues, its conduct could not have voided it.

Reichhold's analysis is confused.  *City of Willmar* did not hold that the *warranty* did not

exist — and that the parties had no rights or responsibilities under the warranty — until the

goods were installed and tested.  It held that a cause of action for *breach* of warranty did not

arise — and thus the statute of limitations on that cause of action did not begin to run — until the

goods were installed and tested.  In this case, Dynamic Air is not arguing that Reichhold's

breach-of-warranty claim should fail because it was brought too late.  Dynamic Air is arguing

that Reichhold's breach-of-warranty claim should fail on the merits because Reichhold voided

-20-

the warranty by making alterations to the system.  Nothing in *City of Willmar* suggests that a buyer can make alterations to a product without voiding a warranty merely because some component of the product has not yet been delivered.  Such a rule would be nonsensical.

Reichhold finally argues that its alterations did not void the warranty because they were not material.  But the warranty does not distinguish between material and immaterial alterations; it simply states that the warranty shall apply only if the system has not been altered.  Reichhold has not cited any provision of the Uniform Commercial Code or any cases holding that a seller of goods cannot condition its warranty on the buyer not making any alterations, material or immaterial.  The Uniform Commercial Code does not require sellers of goods to make any express warranties, and it permits sellers to disclaim implied warranties altogether.  *See* Minn. Stat. § 336.2-316.  Given that sellers can refuse to make *any* express warranty, it stands to reason — and no case suggests otherwise — that sellers can make an express warranty and condition it on the buyer not making any alterations whatsoever.

Dynamic Air limited its warranty by stating that any alteration would void it.  Reichhold made alterations.  Thus, Reichhold voided the warranty.  The Court will therefore grant summary judgment to Dynamic Air on this issue.

### 3.  Negligent Failure to Warn

In its counterclaim, Reichhold alleges that Dynamic Air failed to warn Reichhold of the risks associated with the pneumatic-conveyance system, including the risk of implosion. Dynamic Air moves for summary judgment on this claim, arguing that it had no duty to warn of an improper use that could not have been foreseen and that Reichhold was a sophisticated user

who knew or should have known of the dangers that modifications could create.  Reichhold said nothing in response to Dynamic Air's motion, thus apparently abandoning the claim.

When pressed at oral argument about its lack of response to Dynamic Air's motion for summary judgment on the failure-to-warn claim, Reichhold argued that Dynamic Air employees held themselves out as professional engineers when they were not licensed, and that, as a result, Dynamic Air had a duty to warn.  Reichhold did not specify what type of warning Dynamic Air should have given; presumably Reichhold is claiming that Dynamic Air ought to have warned it of the dangers of dealing with unlicensed persons who provide professional-engineering services.  In any event, Reichhold offers no evidence that Dynamic Air employees ever represented themselves as professional engineers.  Dynamic Air is therefore entitled to summary judgment on this claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    Plaintiff's motion for summary judgment [Docket No. 108] is GRANTED in part as follows:

      a.    The Court holds that all services provided by Dynamic Air to Reichhold after September 9, 2004 were provided pursuant to the terms and conditions found in the parties' initial service contract (covering the period September 7, 2004 to September 9, 2004), a copy of which is in the record as Ex. CC to the Strohl declaration [Docket No. 110].

b. The Court holds that the limitations on recoverable damages found in the parties' contracts — the sales contract, the express service contract, and the implied service contracts — preclude Reichhold from recovering special, indirect, incidental, or consequential damages in connection with any of its claims in this case.

c. The Court holds that Reichhold voided the warranty in the parties' sales contract when it altered the pneumatic-conveyance system.

d. Count I (failure to comply with state licensing requirements for engineering professionals) and Count III (negligence — failure to warn) of defendant's amended counterclaim [Docket No. 76] are DISMISSED WITH PREJUDICE AND ON THE MERITS.

2. Plaintiff's motion is DENIED in all other respects.

3. Defendant's motion for partial summary judgment [Docket No. 120] is DENIED.

Dated: August _7_, 2007

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge